---

## No. 21-30753

---

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

## JESSIE J. GRACE, III
### *Petitioner-Appellee*

## vs.

## TIM HOOPER, Warden, Louisiana State Penitentiary
### *Respondent-Appellant*

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

---

## BRIEF OF APPELLEE

---

**Christopher A. Aberle**
**Attorney at Law**
**P.O. Box 8583**
**Mandeville, LA  70470-8583**
**(985) 871-4084**
**caaberle@gmail.com**

***Attorney for Appellee** Jessie J. Grace, III*

# Certificate of Interested Persons

*Grace v. Hooper* – No. 21-30753

The undersigned counsel of record certifies that there are no persons with a financial interest in the outcome of this appeal, which is taken by the State of Louisiana from a judgment in a habeas corpus case. The Appellee's name and the names of counsel involved in this case are listed below. This information is provided so that the Judges of this Court may evaluate possible recusal or disqualification:

(1)  Jessie J. Grace, III, Appellee

(2)  Christopher A. Aberle, Attorney for Appellee

(3)  Michael G. Riehlmann, Attorney for Appellee

(4)  Michael J. Rocks, Attorney for Appellant

(5)  Christopher Neal Walters, Assistant Attorney General

(6)  Grant Lloyd Willis, Assistant  Attorney General

(7)  Elizabeth Baker Murrill, Solicitor General

s/*Christopher A. Aberle*
Christopher A. Aberle
*Attorney for Appellee*

## Oral Argument Statement

The briefs and record establish that the district court's ruling was a straightforward, factually, and legally correct determination that the state court's adjudication of Grace's claim, premised on the State's suppression of material grand jury testimony, resulted in a decision that was contrary to and involved an unreasonable application of clearly established federal law, *to wit*, *Brady v. Maryland*. As such, oral argument would not significantly aid the decisional process.

# Table of Contents

*Page*

Certificate of Interested Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Oral Argument Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Evidence Presented to the Jury at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Evidence Available at Trial but which the Jury Did Not Get to Hear. . . . . 10

    The Suppressed Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Summary of the Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Arguments

    1.    As the district court correctly held, *Brady v. Maryland* is the
           clearly established authority that controls this case. . . . . . . . . . . . . . 26

    II.   The district court gave all the deference that was due the
           Louisiana Supreme Court's one sentence decision in this case. . . . . 34

    III.  The State's suppression of Temple's and Snow's grand jury
           testimony establishes a clear violation of *Brady v. Maryland*. . . . . . 43

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## Table of Authorities

***Cases***                                                                                       ***Page***

*Ashe v. Swenson*, 397 U.S. 436 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 33

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Carey v. Musladin*, 549 U.S. 70 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Carrillo v. Perkins*, 723 F.2d 1165 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . 28

*Davis v. Alaska*, 415 U.S. 308 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30, 31

*Estelle v. Williams*, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Giglio v. U.S.*, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Greene v. Wainwright*, 634 F.2d 272 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . 28

*Kyles v. Whitley,* 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Langley v. Prince*, 926 F.3d 145 (5th Cir. 2019) (en banc) . . . . . . . . . . . 31, 32, 33

*Lopez v. Smith*, 574 U.S. 1 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Mullenix, v. Luna*, 136 S. Ct. 305 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30, 31

*Passman v. Blackburn*, 797 F.2d 1335 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . 45

*United States v. Beale*, 921 F.2d 1412 (11th Cir.1991). . . . . . . . . . . . . . . . . . . 45

*United States v. Blakey*, 14 F.3d 1557 (11th Cir.1994) . . . . . . . . . . . . . . . . . . . 45

*United States v. Crumley*, 565 F.2d 945 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . 28

*United States v. Hand*, 184 F.3d 1322 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . 45

*United States v. Johnson*, 495 F.2d 242 (10th Cir. 1974) . . . . . . . . . . . . . . . . . . . 45

*Velarde v. Shulsen*, 757 F.2d 1093 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . 45

*Virgin Islands v. Testamark*, 528 F.2d 742 (3rd Cir. 1976). . . . . . . . . . . . . . . . . 45

*Wilson v. Sellers*, 138 S. Ct. 1188 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Statement of the Case**

The State presents only an abbreviated and sterile rendition of the facts, which come verbatim from the 1994 decision of the state appellate court affirming Grace's conviction.[1]  Because the important issues presented in this petition cannot be fairly evaluated if divorced from the context of a full and fair presentation of the facts surrounding the offense and the prosecution of this case, those facts, which are fully supported by the record, are presented here.

***Evidence Presented to the Jury at Trial***

John Wayne Palmer met his demise early in the afternoon on February 21, 1993, when someone shot him during a drug deal on the grounds of the Jefferson Place Apartments in Marrero.[2]  The 20-year-old Palmer, referred to as "Wayne" throughout the trial, was driving around the Westbank in Jefferson Parish with his 18-year-old girlfriend Michelle Temple, in search of some "make ups" or "double ups," large rocks of cocaine that can be divided and resold at a 100% profit, thus enabling the purchaser to "double" his money.[3]  According to Temple, as they neared the

---

[1] Blue brief at 2-3.

[2] ROA.815, 915-18, 932.

[3] ROA.818, 1027, 1029, 1056.  *See* ROA.1134, 1180, 1191.

-1-

Apartments, Wayne spotted his friend Jamal.[4]  Temple stopped the car, and Wayne got out to meet with Jamal.  She had given Wayne $100 to buy some crack, and she recalled that he also had some of his own money, though she did not know how much.[5]  After Wayne exited the car, Temple pulled up the street a little further and parked.[6]

Meanwhile, Temple observed Wayne and Jamal walking down the street until they met up with Sherman Moses.[7]  Temple described Moses as "somebody Wayne knows."[8]  Wayne and Moses then walked across the street and interacted with some people hanging out there.[9]  Wayne then returned to the car and was prepared to get in when Moses urged him: "No, man.  Come on.  They got something.  Come see it."[10]  Moses and two other unidentified persons then accompanied Wayne down an alley, out of Temple's view.[11]

---

[4] ROA.1029, 1038.

[5] ROA.1029, 1068.

[6] ROA.1029.

[7] ROA.1029.

[8] ROA.1038.

[9] ROA.1029-30.

[10] ROA.1030.

[11] ROA.1030-31, 1038-39.

The next thing Temple noticed was a lot of people running, including Jamal and Moses. She then noticed Wayne on the ground, and she drove around to the other side of the building, got out of her car with a handgun, and ran up to Wayne. According to her direct examination testimony, first she stayed there with Wayne, then she "walked a little piece down the road," then she came back to Wayne, who was still alive, but unable to talk. She indicated that she then put her gun down on the ground, and a girl named Nickey took the gun away. At one point, Temple tried unsuccessfully to pick Wayne up to put him in the car. Then a nurse walked up and put a towel under Wayne's head. Temple then went with Wayne's cousin to an apartment to call the police, before coming back to Wayne a final time.[12]

Temple testified that she did not see who shot Wayne.[13]

On cross-examination, Temple revealed that while she was still in the car she observed a man kneeling next to Wayne, who was lying on the ground. She described him as 19 or 20 years old, only about 5'4" or 5'5" tall, and weighing between 140 or 150 lbs. He wore blue Dickies brand pants and a dark Oakland Raider's jacket. She also noticed that he had a "fade" haircut. Defense counsel asked if the man had "a

---

[12] ROA.1031-33, 1058.

[13] ROA.1035.

gun or anything," and she replied that she did not "know what he had." Counsel then asked if he had something in his hand, and she said "yes."[14]

Temple also revealed that there was another man on the scene near Wayne's body who had threatened her. The man called her a "bitch," told her to let Wayne "lay there and die," and warned her to leave or she "would be next." She described this person as being about 5'5" and wearing a "striped outfit."[15]

Forensic evidence revealed that Wayne was shot twice with a .38 caliber weapon. One shot to the head above Wayne's right ear was not fatal, as the bullet failed to penetrate his skull. The fatal gunshot wound entered Wayne in the back and lodged in his chest cavity. The murder weapon was never found.[16]

Wayne's murder was committed in broad daylight in a public area, and despite there being 100 to 150 people on the scene when the police arrived, no one volunteered any information to the police as to who shot John Wayne Palmer.[17] Nevertheless, the "word on the street" was that Sherman Moses, a drug dealer with three prior convictions for theft and purse snatching, had set up the killing. That

---

[14] ROA.1058, 1060-61, 1064.

[15] ROA.1059, 1062.

[16] ROA.816-21, 898, 902.

[17] ROA.918, 924, 1075, 1079.

-4-

word reached Wayne's relatives, who physically attacked Moses about an hour after the police arrived at the scene of the crime.[18]  After the police broke up the fight, Moses was brought to the police station.[19]  According to the case officer, the police "transported" him to the station for an "interview" because he was a "witness [who] had returned to the scene.[20]  According to Moses, however, the police handcuffed him and arrested him for first degree murder.[21]

At the police station, Moses told the police that 16-year-old Jessie Grace, whose nickname was "Snow," was the one who shot John Wayne Palmer.  Moses then showed the police where Grace sometimes stayed with his aunt in one of the units at the Jefferson Place Apartments.  There, the police encountered Grace's aunt, who explained that Grace was not there.  She told the police that she would try to find him and advise him that they were looking for him, and while the police were on their way to another address they had for Grace, he showed up at the police station with his mother.[22]

---

[18] ROA.1187-88, 1191.

[19] ROA.943-44.

[20] ROA.1080, 1103.

[21] ROA.1184, 1196-97, 1200.

[22] ROA.1084-85, 1091, 1110-1112.

After the police released Sherman Moses, he disappeared, and, after searching for him for several months, the police again found him, presumably when they arrested him for possession of stolen property. Thus, when Moses testified against Grace, Moses was in jail facing a fourth felony conviction, though he claimed he was promised nothing in exchange for his testimony.[23]

At trial, Moses claimed that at the time of the crime, he was hanging around the Jefferson Place Apartments selling drugs and smoking marijuana when Wayne drove up.[24] He claimed that although it was early in the day, he had already smoked an entire "dime bag" of marijuana, which he explained was eight or nine joints.[25] Wayne, whom Moses claimed was his close friend, was in search of some "big rocks" that he could cut up and resell.[26] Wayne approached his cousin Troy McCloud and some other people but came up empty until Derrick Hudson, also known as "Nine-One-One" or just "Nine," approached and said, "I got something."[27]

---

[23] ROA.1118, 1178-79.

[24] ROA.1191, 1202.

[25] ROA.1203.

[26] ROA.1180, 1184.

[27] ROA.1180. Hudson's first name is spelled several different ways throughout the record. "Derrick" is the spelling used by the Department of Corrections.

Wayne then told Moses to go stand by his car and protect Michelle Temple, since she was a white woman in an all-black neighborhood.[28]  Wayne then went with Hudson into the breezeway.  Moses said he saw Grace go there as well.  Then Moses claimed that he heard someone say "Up it.  Up it."  Moses then looked in the breeze way and saw Grace hit Wayne in the mouth with a black .38 "snubbed nose" pistol, which Moses claimed he had seen Grace brandishing about earlier in the day, "running around shooting in Jefferson Place and scaring people."[29]

As Moses's testimony is often ambiguous and difficult to understand, a fair portrayal of what he claimed to see next is best accomplished by a verbatim account:

> The man fell down on the wall.  Mr. Derek, Nine One One, snatched the man's jewelry and he said, "You have the money Bro," and the man begged him, "Please, don't shoot me, Please," begging, "Please don't shoot me," and he laid there and he shot the man.  He had the gun up like this (indicating) toward the man and the man was walking off and he took off running and he shot the man.  He shot three times.  He hit the man in the back of the head.  The man fell down.  I was paranoid. I was on drugs at the time.  I was shocked.  You know what I'm saying. I was shocked at what happened and I walked off and then I don't know where he disappeared to.  All I know they was coming around and stuff and saying I did it.  I ain't had nothing to do with it.  But I saw Mr. Jessie Grace shoot the man with the gun.[30]

---

[28] ROA.1180.  *See* ROA.918, 1030.

[29] ROA.1180-81, 1183.

[30] ROA.1181.

Moses claimed that after the shooting, Temple got out of her car with her gun, came up to him, and asked him who had shot Wayne. Moses claimed he told her that the guy who did it ran off and left in a "getaway car."[31]

Finally, Moses testified that while he was subsequently put in jail for a parole violation, Grace wrote him several letters in which Grace used both threats of violence and promises of free drugs if Moses would agree not to testify against him and to put the blame on Derrick Hudson. Moses, however, claimed that he destroyed the letters that Grace had sent him by flushing them down the toilet.[32]

Eighteen-year-old Derrick Hudson, a high school dropout with a juvenile record for drug and shoplifting offenses, was nowhere to be found following the shooting, and it took the prosecution several months to find him.[33] He testified that he was drinking with his cousin when he observed Wayne drive up and meet Sherman Moses. Moses and Wayne then came up to him looking for some crack cocaine. Hudson told them that he did not have any, but he walked them across the street to where Jessie Grace was and told Grace that Wayne wanted to spend some money. Grace then went upstairs got some drugs and his gun, and he came back down. He

---

[31] ROA.1182.

[32] ROA.1187.

[33] ROA.1118, 1121, 1132, 1156-57.

then directed Wayne around the corner.  Hudson and Moses both followed Wayne and Grace around the corner, contrary to Moses's claim that he stayed back to keep an eye on Michelle Temple.[34]

As Hudson and Moses stood together in the grass only five or ten feet away, they watched Wayne hand $200 to Grace, who gave Wayne $200 worth of drugs.[35] According to Hudson, both he and Grace somehow knew that Wayne had $500 dollars on him but that Wayne only wanted to spend $200.  Thus, according to Hudson's arithmetic, after Wayne gave Grace $200, Wayne still had $200 left on him.[36]  Grace then pulled out his gun, hit Wayne in the mouth, and ordered him give up the rest of his money.[37]

Wayne surrendered his money and begged for his life.  Hudson claimed that as Wayne was walking away, the young Jessie Grace shot him in the back.  Hudson then "just walked off."  He thinks that Grace went upstairs to his aunt's apartment.[38]

Hudson further testified that at some time between the shooting and the trial eleven months later, Grace called Hudson and asked both him and his cousin Leonard

---

[34] ROA.1133.

[35] ROA1134, 1158-59.

[36] ROA.1133-34, 1159.

[37] ROA.1134.

[38] ROA.1134.

if they would testify that Grace did not shoot Palmer. Hudson claims he appeased Grace by telling him that he would so testify, but he never had any intention of actually doing so.[39]

### *Evidence Available at Trial but which the Jury Did Not Get to Hear*

The jury's decision to believe Sherman Moses and Derrick Hudson was made without the benefit of knowing the following crucial information:

**1.    The man Temple saw "kneeling next to" Wayne Palmer and holding something in his hand was (a) actually pressing an object *against Wayne's left temple*, (b) had been with Wayne during the ill-fated drug deal, and (c) closely fit the physical description of, and was wearing the same clothing as, Derrick Hudson.**

At trial, the prosecution did not ask Temple about any particular man she saw next to Wayne after the shooting, and she never mentioned such a man in her direct-examination account of the murder of her boyfriend. Knowing that Temple had described such a man in her pretrial statement, however, defense counsel elicited during cross-examination a detailed description of the man. Counsel, however, otherwise established only that this person was "kneeling next to" Wayne and that the person had something in his hand. In the end, the jury had no reason to ascribe any significance to the kneeling man, given that his presence appeared to be of no

---

[39] ROA.1137, 1164-65.

significance to Temple, who did not even mention him in her account of the crime given on direct examination. The jury perhaps thought this man was simply trying to render aid. Or perhaps he was kneeling with a Bible in his hand to provide comfort to the dying victim.

But Temple's written statement, given only a couple of hours after the shooting, suggests quite a different story. From her car window, where she sat with the music too loud to hear any gunshots, she saw everyone running. She then "looked back and Wayne was on the ground and the guy had something to his head." She recalled specifically that Wayne was lying "on his right side," his "body was jumping," and the man was pressing something against Wayne's left temple, which was the opposite side of head from the bullet wound. Temple further revealed in her statement that prior to the shooting, Wayne had been talking to this same man. Never in her statement did she describe the man as "kneeling," and although Temple was purportedly too far away to see what the object was (but see her suppressed grand jury testimony, *infra*), her description of what she saw led the interviewing police officer to assume that the man was holding a "gun to his head." Ms Temple did not challenge the officer's assumption.[40]

---

[40] ROA.770-79.

In other words, Temple's statement raises the strong and obvious suggestion that this man had shot Wayne Palmer, followed him as he stumbled out of the alleyway, and then walked up to him and held the gun to his head, perhaps to make sure he was dying or to snatch more money or jewelry from him.  Given that the man Temple saw was 19 or 20 years old, only 5'4" or 5'5" tall, and weighing about 140 or 150 lbs, it is clear that this person was not Jessie Grace, who was 16 years old, 6'0" tall, and 205 lbs.[41]

Not only was the person she saw someone other than Grace, there is a strong suggestion that this person was Derrick Hudson (a suggestion strengthened by her suppressed grand jury testimony discussed below), notwithstanding that Temple was purportedly unable to identify Hudson from a photo lineup.[42]  According to the transcribed verbatim statement Sherman Moses gave to the police immediately after the shooting, he described the 18-year-old Hudson as being about 5'5", medium build, with a fade hair cut.  Notably, he recalled that Hudson wore blue or black Dickies brand pants.[43]  This description is nearly identical—same height, weight, haircut, and pants—to the one Temple provided of the man she saw pressing something against

_____

[41] ROA.1116.

[42] ROA.1092, 1095.

[43] ROA.785-88.

Wayne's head.  The only difference is that Temple described the man's coat, while Moses description of clothing was partially inaudible, though he described Hudson's shirt.

### 2.    Contrary to his trial testimony, Sherman Moses did indeed tell Detective Maggie Snow that he had not actually seen Grace shoot John Wayne Palmer.

At trial, at the prosecution's elicitation, Sherman Moses gave a detailed eyewitness description of the shooting, concluding: "I saw Mr. Jessie Grace shoot the man with the gun."[44]  And on cross-examination, in response to being asked if he had ever told the police that he had not actually seen the shooting, Moses responded:  "I told them, yes, I saw Snow pull the gun out and shoot him."[45]

But this testimony is contrary to Moses's recorded, transcribed, verbatim statement given only hours after the shooting to the lead detective Sgt. Maggie Snow. In attempt to sort through Moses's confusing and often ambiguous statements, Sgt. Snow finally asked him point blank: "You saw Snow [Grace] pull the gun and shoot him?"  To that question, Moses responded: "I ain't saw it, you can put it like that, he killed him.  He killed him, cause he was the only asshole that do shit like that."[46]

---

[44] ROA.1181.

[45] ROA.1201.

[46] ROA.783.

**3.**  **Contrary to his trial testimony, Derrick Hudson told Sgt. Snow only a week before trial, that he was not anywhere around the scene of the crime when the shooting took place.**

Hudson testified at trial that he witnessed the shooting and everything that led up to it.  He also testified that he had discussed the shooting with Detective Snow prior to trial and that during that discussion he had never told her that he was actually not present at the crime scene.[47]  But his recorded, transcribed, verbatim statement given to Detective Snow only one week before trial proves his testimony was false. In that statement, Hudson never discussed the murder and never gave any indication that he was a witness to any part of it.  Quite the contrary, he repeatedly explained that he had "nothing to do with" the shooting, and more specifically, he stated that "everybody know I wasn't out there."[48]

**4.**  **At the time of Grace's trial, Hudson was in the Jefferson Parish Jail facing drug charges, and at trial, out of the jury's presence he repeatedly suggested that he was testifying in order to get himself out of trouble.**

At the time of trial, Hudson was in prison on pending charges for possession and distribution of cocaine.[49]  Grace sought permission to cross-examine Hudson

---

[47] ROA.1169-70.

[48] ROA.790.

[49] ROA.1140-42.

regarding the pending charges, and the prosecutor objected. The court thereafter conducted an examination of Hudson outside of the jury's presence for the purpose of determining whether Grace should be allowed to question him in front of the jury. During that examination, Hudson stated several times: "I am trying to get myself out."[50] Defense counsel made repeated attempts at discerning his precise meaning, and though he was able to clarify that Hudson was trying to get himself out "of trouble" and avoid "going down," defense counsel was unable to shed anymore light on this statement due to the State's incessant objecting and Hudson's penchant for giving nonresponsive answers.[51]

Additionally, as if to keep making a "slip of the tongue," Hudson suggested that the prosecution actually *told* him what to say at trial:

> A. . . . . They [the prosecution] asked me do you know what you're in [jail] for now. I said for what? Because they had told me - - they reminded me of the last Mardi Gras what went down by Snow and I just remembered what happened what went down.
> Q. They reminded you; is that correct?
> A. They just told me what happened.
> Q. They told you what happened?
> A. What?
> Q. They told you what happened?
> A. I said they told, they reminded me . . . .[52]

---

[50] ROA.1146.

[51] ROA.1146-50.

[52] ROA.1146.

In the end, the court ruled that Grace was not allowed to question Hudson in front of the jury regarding any matters related to his incarceration or his pending charge. And because the prosecution advised Hudson not to reveal that he was incarcerated, Hudson, taking advantage of the license given him to lie to the jury, told the jury that he was in his own house when the police called upon him to testify, though he was, in fact, sitting in a jail cell.[53]

### *The Suppressed Evidence*

The following evidence consists of the suppressed grand jury testimony identified by the district court in its *in camera* review.

> **1.    Michelle Temple testified to the grand jury that she saw the man who shot John Palmer and that she picked him out of a line up presented to her by Sgt. Snow. Her description of the shooter overwhelmingly implicates Derrick Hudson and casts considerable double on the guilt of Jessie Grace.**

Michelle Temple was one of three witnesses who testified before the grand jury. Her testimony spans 10 pages of the 26-page grand-jury transcript. Of that testimony, this Court disclosed the following to Grace:

> Q. Did you see the guy that shot him?
> A. Yes.
> Q. Did you see pictures of him later and were you able to identify him?

---

[53] ROA.1158.

A.  The pictures - - a detective has shown me some pictures and I said that that was him.

Q.  And that was the man you saw?

A.  Yes.

Q.  Did you actually see the shooting?

A.  Yes.

Q.  You actually saw him shoot John Palmer?

A.  I seen the gun to his head and I had got out the car and he was already shot, but I had seen the gun to his head.

Q.  You saw the guy Jessie Grace holding the gun to his head?

A.  Yes.

[REDACTED]

A.  [REDACTED] see I was parked across the street and I was looking in the rearview mirror, but thy were just talking and when I turned my head and looked back in the mirror I seen John on the ground and they were kicking him.  But I though that they were beating him up and robbing him and when I got out of the car I had seen the gun to his head and they had already shot him and they took off running.

Q.  What did you do then?

A.  I ran after Jessie and the boy they called Nam, but they were running down the street and went back by John.  He was on the ground.[54]

The irreconcilable conflicts between Temple's grand jury testimony with her trial testimony caused the district court to conclude that "it is simply impossible that she was telling the truth on both occasions."[55]  There are at least four such impossibly irreconcilable aspects of her testimony.

---

[54] Supplemental Sealed Record on Appeal.  *See* Rec. Doc. 98-1, pp. 11-13 (sealed attachment).

[55] ROA.2559.

First, at trial, on direct examination, Temple denied ever seeing who shot the victim, and she denied saying otherwise to the police:

> Q. Did you ever tell any of the police that you talked to that you saw who shot Wayne?
> A. No. I did not.
> Q. Did you see who shot Wayne.
> A. No.[56]

But in her grand jury testimony, Temple swore that she saw who shot Palmer and that she identified him for Sgt. Snow by picking him out of a photo lineup.

Second, Temple denied on direct examination at trial that she had identified anyone from any photos shown to her by Sgt. Snow:

> Q. When you talked to Sergeant Snow, did she ever show you any photographs of anybody?
> A. Yes.
> Q. When she showed you those photographs, were you able to identify anybody?
> A. No. Not really.
> Q. She was asking you to identify the people who you had seen around the body.
> A. Yes.
> Q. And you weren't able to do that.
> A. No.[57]

But in her grand jury testimony, Temple said she identified the "guy" that shot Palmer in photos shown to her by Sgt. Snow.

---

[56] ROA.1035.

[57] ROA.1036-37.

Third, Temple told the grand jury that she saw Palmer in her rear view mirror being kicked and that she got out of the car and saw the gun to his head just before "they" ran off and right after Palmer had been shot. At trial, the State never asked Temple about this seemingly crucial event, and Temple did not refer to this event at any time during her direct examination testimony. On cross examination, however, she explained that she had seen an unknown person kneeling next to Palmer, and when pressed about whether this person had a gun in his hand, Temple would only say "I don't know what he had."[58]

Fourth, Temple effectively denied having ever even testified before a grand jury:

> Q. And all of this happened when you talked to the police and you looked at these photographs, that was all the same day that Wayne was shot.
> A. I talked to the police the same day that she had showed me the photographs later on.
> ***Q. And between now and then have you talked to anybody from the police office or the DA's Office until today?***
> ***A. No.***[59]

The crime occurred on February 13, 1993. One month later, on March 11, Temple appeared before a grand jury and gave sworn testimony through her answers to questions asked by an assistant district attorney. Hence, her representation that she

---

[58] ROA.1060.

[59] ROA.1036-37 (emphasis added).

did not talk to anybody from the district attorney's office at any time after the day of the shooting is patently false.

Given Temple's trial testimony and her written statement in which she provided a detailed physical and clothing description of the man kneeling next to the victim, holding something to the victim's head, her sworn grand jury testimony gives undeniable support to the conclusion that Temple saw Derrick Hudson holding a gun to her boyfriend's head and that Hudson was the person whom she told the grand jury that she saw shoot her boyfriend and whom she picked out of a photo lineup shown to her by Sgt. Snow.

This evidence contravenes entirely the State's theory of the case, thus raising questions as to why, consistent with that theory, Temple testified at trial that she saw nothing useful to solving the crime. Thus, she denied seeing who shot Palmer. She denied identifying anyone from photographs. She omitted entirely from her direct examination testimony any description of the events related to man she saw "kneeling" next to Palmer, as if the additional facts, extracted through cross examination, were unimportant, facts such as Hudson's close match to Temple's description of short, slender man with a fade haircut, wearing Dickies brand pants. Even on cross, however, she would not concede, contrary to her grand jury testimony, that she saw a gun in the man's hand and that the man was holding that gun to the

decedent's head. That the State may have influenced Temple's trial testimony to comport with its theory of the case is an inescapable and not unreasonable theory that the jury should have been allowed to assess for itself.

> **2.     Sgt. Snow's grand jury testimony provides further support for the defense theory that the State pursued a prosecution against Jessie Grace only because Derrick Hudson skipped town right after the shooting and could not be found until trial was about to begin.**

Sgt. Snow told the grand jury that Temple did not see the shooting but that she did see that Grace "was there, but not that he shot."[60] This testimony not only conflicts with Temple's grand jury *and* trial testimony (in which Temple told the grand jury that she had seen the shooting and could identify the shooter but then told the jury that she did not see the shooting, the shooter, or Jessie Grace) but Snow's grand jury testimony conflicts with Snow's own trial testimony, in which she claimed she did not even bother to show Temple a photo that had Grace in it because Temple had not seen the shooting and because Grace "had never been placed out in this area at all. He was placed back here in this area and Michelle did not see . . . ."[61]

---

[60] Supplemental Sealed Record on Appeal. *See* Rec. Doc. 98-1, p. 6.

[61] ROA.1095-96.

-21-

Snow also told the grand jury that Derrick Hudson had acted in concert with Grace. She testified: "They robbed him and shot him. Nam [Hudson] did the robbing. It was a cooperative effort on both of them." She explained that as a result of his suspected involvement in the crime, she planned on charging him with "first degree murder" and would "shortly" be getting a warrant for his arrest.[62] Sgt. Snow's assessment of Hudson's culpability is not surprising given the pretrial statements of Moses, Hudson, and Temple, Moses's trial testimony, and Temple's undisclosed grand jury testimony. Thus, as the district court observed: "It seems incredible . . . that Hudson was not advised of his potential criminal culpability in the very matter in which he would be called to testify,"[63]

But at trial, the State did its best to make the jury think that Hudson was not involved. Hence, Sgt. Snow made no mention to the jury of any prior intent to arrest Hudson for murder, nor did she suggest that he had ever been a suspect. Quite the contrary, Sgt. Snow identified Hudson as nothing more than a "witness" to the crime.[64] She explained that she had shown Temple a lineup with Hudson in it "because Derek was listed as one of the *witnesses* to the incident." Sgt. Snow

---

[62] Supplemental Sealed Record on Appeal. *See* Rec. Doc. 98-1, p. 7.

[63] ROA.2559.

[64] ROA.1092, 1095.

explained that she had been "*advised*" that Hudson "was a *witness* to the incident and had been there when it happened." She eventually caught up with Hudson just before trial and confirmed that he was "on the scene."[65] Furthermore, due to the thoroughly misguided ruling of the trial court forbidding counsel from exploring any potential motives Hudson may have had to give testimony favorable to the State, the jury was not even allowed to know that at the time of the trial, Hudson was in the custody of Jefferson Parish with pending drug charges.[66]

In sum, Sgt. Snow's grand jury testimony is further evidence that the sham presentation of Hudson as a mere blameless witness to the crime was a grotesquely misleading charade that unfairly served to give unwarranted credence to a witness who may well have been a murderer.

---

[65] ROA.1095 (emphasis added).

[66] *See* ROA.702-08.

## Summary of the Arguments

1.     **As the district court correctly held, *Brady v. Maryland* is the clearly established authority that controls this case.**

The State argues that the Supreme Court's holding in *Brady* is too general to support habeas relief and argues further that the district court erred in citing no Supreme Court decisions that support the proposition that "the mere fact that a witness is under investigation is itself material." Aside from constituting a challenge to only a limited aspect of the district court's ruling, the State's contention, which has nothing to do with materiality, only favorability, has not merit. The Supreme Court has long recognized the impeachment value arising from a witness who may be motivated to please the state when the state has the power over the witness's freedom, a holding that easily comprises witnesses who are under investigation. In any case, habeas law does not require the level of specificity of clearly established federal law here urged by the State.

II.     **The district court gave all the deference that was due the Louisiana Supreme Court's one sentence decision in this case.**

The State contends that the district court failed to give proper deference to the findings and conclusions of the majority opinion of the Louisiana Court of Appeal for the Fifth Circuit, which reversed the state trial court's grant of postconviction relief

on the *Brady* issue raised herein.  The district court, however, owed no deference to that court's analysis because the last reasoned judgment of the state court as that of the Louisiana Supreme Court.  In any case, the intermediate appellate court's ruling followed only from a parade of unreasonable, at times nonsensical, factual and legal conclusions.

## III.   The State's suppression of Temple's and Snow's grand jury testimony establishes a clear violation of *Brady v. Maryland*.

The State argues that the suppression of the grand jury testimony of Michelle Temple and Sgt. Snow was not material in light of the "overwhelming" evidence of Grace's guilt.  But the evidence is quite obviously far from overwhelming.  As the district court found, Grace's "guilt rested solely on the eyewitness testimonies of Hudson and Moses [and t]he grand jury testimony raises serious credibility concerns regarding Hudson, and indeed, may even inculpate him as the murderer—leaving only the eyewitness testimony of Moses, a felon high on drugs with a motive to point the finger elsewhere, to support the conviction."  The record fully supports that conclusion, which is beyond any good-faith challenge to the contrary.

## Arguments

**I.**     **As the district court correctly held, *Brady v. Maryland* is the clearly established authority that controls this case.**

### (*Responsive to Blue Brief at 16-21*)

The district court granted habeas relief upon finding that the state withheld evidence—secret grand jury testimony—that not only directly affected the credibility of two key state witnesses, but, in the case of Michelle Temple, also directly inculpates Derrick Hudson, not Grace, as the perpetrator of the crime.[67]   The court, of course, relied for its ruling on the due process principle first identified by the Supreme Court in *Brady v. Maryland*, which holds that the state may not suppress material evidence that is favorable to the defense,[68] including impeachment evidence.[69]   The Supreme Court has also made clear that impeachment evidence broadly includes any evidence affecting credibility.[70]   In other words, a more

---

[67] ROA.2988-92.

[68] *Brady v. Maryland*, 373 U.S. 83 (1963).

[69] *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("nondisclosure of evidence affecting credibility falls within" the *Brady* rule).

[70] *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand."); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

straightforward application of clearly established Supreme Court precedent to a more straightforward violation of that precedent could hardly be imagined.

But the State argues that the Supreme Court's holding in *Brady*—that the suppression by the prosecution of favorable material evidence violates due process—is too general by itself to support habeas relief, such that no petitioner can succeed on a *Brady* claim without reliance on an additional Supreme Court case that has applied *Brady* to "the specific factual context at issue."[71] According to the State, "[o]nly Supreme Court cases about the *Brady* doctrine are sufficiently specific to bind and guide the state courts as they conduct their analysis."[72]

The State thus contends that the district court erred and that its judgment granting habeas relief must be reversed in light of the following portion of the district court's analysis, for which the court relied only on Fifth Circuit precedent:

> Petitioner was convicted wholly on the eyewitness testimonies of Hudson and Moses. There was no physical or forensic proof in this case, and Petitioner did not make a statement. The undisclosed grand jury testimony of Sgt. Snow raises significant questions regarding Hudson's credibility and motivation for testifying. Sgt. Snow's grand jury testimony established Hudson as a co-perpetrator who would be arrested for his involvement in the murder. At trial, he was treated as merely a witness, and the jury was not made aware of Sgt. Snow's prior intent to charge him with first degree murder.

---

[71] Blue brief at 17-18.

[72] *Id*. at 21.

The State makes much of the fact that there has been no evidence of a deal between Hudson and the State. The Fifth Circuit has made clear, however, that whether a witness made a deal with the State is not dispositive. "What counts is whether the witness may be shading his testimony in an effort to please the prosecution." The Fifth Circuit has found that the Confrontation Clause was violated when a defendant was not permitted to cross-examine a witness-accomplice on his vulnerability to prosecution on an unrelated charge at the time that he testified. The court held that "the crucial factor is whether the jury might have been persuaded that [the witness's] vulnerability to prosecution made him wish to assist the state and that this motivation compromised his credibility." Indeed, "[a] desire to cooperate may be formed beneath the conscious level, in a manner not apparent even to the witness, but such a subtle desire to assist the state nevertheless may cloud his perception."

Here, Petitioner could have explored the effect of Hudson's vulnerability to prosecution in this matter had he been aware of Sgt. Snow's prior intention to charge Hudson in the murder. "Certainly the fear of additional . . . charges and prosecution might motivate a witness to testify favorably on behalf of the government." Further, the fact that Hudson was not charged (and indeed, has never been charged) for his involvement in the crime is favorable treatment of which the jury should have been made aware. This favorable treatment unquestionably bears on his credibility and motivation for testifying.[73]

The State objects to the district court's analysis insofar as it contradicts the state intermediate appellate court's finding that Snow's testimony "was not material—in part because there was absolutely no evidence of any deal or agreement between Hudson and the prosecution."[74] The State argues that the district court's

---

[73] ROA.2989-90 (omitting footnote citations to *Carrillo v. Perkins*, 723 F.2d 1165 (5th Cir. 1984); *Greene v. Wainwright*, 634 F.2d 272 (5th Cir. 1981); *United States v. Crumley*, 565 F.2d 945 (5th Cir. 1978)).

[74] Blue brief at 20.

analysis quoted above cites only Fifth Circuit law rather than Supreme Court decisions, and therefore does not constitute clearly established federal law. The State then argues that "[t]he Supreme Court has never held that the mere fact that a witness is under investigation is itself material."[75]

Aside from ignoring entirely the district court's application of *Brady* to Michelle Temple's suppressed grand jury testimony, there are several problems with the State's contention. First, it is of no moment that the "state intermediate appellate court concluded this testimony was not material." The decision under review in this petition is that of the Louisiana Supreme Court, which held merely that Grace "fail[ed] to show that the state withheld material exculpatory evidence in violation of *Brady*."[76]

Second, the import of being "under investigation" is not a question of materiality, which depends on an assessment of the effect of suppression on the likelihood of a different outcome. Rather, the question more appropriately concerns favorability, that is, whether the fact that a witness is, or may potentially be, under investigation is favorable to the accused because it is either impeaching or

---

[75] Blue brief at 20.

[76] ROA.2681.

exculpatory.  As the district found, the State has not contested whether the evidence was favorable to the defense.[77]

Third, and more important, the Supreme Court has long recognized the impeachment value that arises from a witness who may be motivated to please the state when the state has the power over the witness's freedom.  For example, in *Davis v. Alaska*, the Supreme Court held that the district court erred in refusing to allow the defendant to cross examine a witness regarding the fact that the witness was on probation at the time of his testimony, particularly given that the witness, like Hudson, could have been implicated in the same crime with which the defendant was charged.  In so holding, the Supreme Court declared:  "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'"[78]  All three of the Fifth Circuit cases cited by the district court in the above quoted passage rely squarely on *Davis* for their holdings, and contrary to the State's contention, it does not matter that those cases,

---

[77] ROA.2978.

[78] *Davis*, 415 U.S. at 316 (quoting 3a J. Wigmore, Evidence § 940 p. 775 (Chadbourn rev. 1970)).  *See also Napue*, 360 U.S. at 270 ("Had the jury been apprised of the true facts, however, it might well have concluded that Hamer had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which Hamer was testifying, for Hamer might have believed that such a representative was in a position to implement (as he ultimately attempted to do) any promise of consideration.").

-30-

including *Davis*, concern a confrontation-clause challenge[79] because the question concerns favorability, *i.e.*, impeachment value, which is defined the same way whether the claim is premised on *Brady, Davis*, *Napue*, etc.

Finally, and related to the previous point, the suggestion that habeas relief for a *Brady* violation must be supported by a factually identical case is not supported by the case law. Grace recognizes that clearly established law cannot be defined at too "high a level of generality,"[80] but the State now advocates for an unwarranted level of specificity. Thus, purporting to quote from this Court's decision in *Langley v. Prince*, the State argues: "It is not enough to say . . . that the [*Brady*] doctrine forms the relevant clearly established law, or that [*Brady*] established the governing principles."[81]

Here the State misleadingly attempts to squeeze more out of *Langley* than that case has to give. First, the doctrine referred to in *Langley* was not the *Brady* doctrine but the *Ashe* doctrine, which holds that double-jeopardy concerns bar "retrial for any issue necessarily determined by a jury's general *verdict of acquittal*."[82] More

---

[79] Blue brief at 20-21.

[80] *Lopez v. Smith*, 574 U.S. 1, 6 (2014).

[81] Blue brief at 17 (quoting *Langley v. Prince*, 926 F.3d 145, 156 (5th Cir. 2019) (en banc) (brackets inserted by Appellant)).

[82] *Langley*, 926 F.3d at 150 (citing *Ashe v. Swenson*, 397 U.S. 436 (1970) (emphasis added).

important, the petitioner in that case was not relying on a straightforward application of *Ashe*. Rather, Langley sought to extend the "narrow" holding in *Ashe* to factual issues determined by a jury's *verdict of guilt*, and it is in this specific context that this Court held: "It is not enough to say . . . that the *Ashe* doctrine forms the relevant clearly established law, or that *Ashe* established the governing principles."[83]

In *Langley*, this Court found that the petitioner's claim was akin to that rejected *Carey v. Musladin*, which involved a due process claim related to family members of the victim sitting in the courtroom during petitioner's trial wearing buttons with the victim's photo on it.[84] The petitioner in *Musladin* argued that his claim was controlled by *Estelle v. Williams*, which held that a defendant's right to a fair trial is violated when he is forced to appear in prison garb. In holding that *Williams* did not control the petitioner's claim, the Supreme Court in *Musladin* noted that *Williams* involved a "state-sponsored courtroom practice" that was assessed in light of the degree to which the practice was justified by an "essential state policy or interest," unlike the petitioner's claim, which involved private conduct unrelated to any state interest.[85]

---

[83] *Id.* at 157.

[84] *Id.* (citing *Carey v. Musladin*, 549 U.S. 70 (2006)).

[85] 549 U.S. at 75-76 (citing *Estelle v. Williams*, 425 U.S. 501 (1976)).

Regarding the limits of generality of clearly established law, this Court has noted that the "dispositive question is whether the violative nature of particular conduct is clearly established."[86]   The *nature* of the conduct complained of in *Langley*—refusing to find that a prior guilty verdict had issue preclusive effect—was held to be of a different *nature* from the conduct addressed in *Ashe*—whether a prior acquittal gives rise to issue preclusion.   Similarly, the *nature* of the conduct complained of in *Musladin*—allowing private courtroom spectators to wear buttons—was held to be different from the nature of the conduct at issue in *Williams*—forcing the defendant to wear prison clothes.

But unlike the holdings in *Ashe* and *Williams*, the Supreme Court's *Brady* jurisprudence is both broad and straightforward, prohibiting the suppression of material impeachment evidence that is favorable to the defense.  Whether something has impeachment value, that is, has the tendency to affect the jury's assessment of a witness's credibility, is a question that does not require further parsing.  In other words, by insisting that a *Brady* claim can succeed only when accompanied by a factually identical case, the State is not looking to the *nature* of the particular conduct but at the particularity of that conduct.  Such level of specificity would effectively render *Brady* a nullity.

---

[86] *Langley*, 926 F.3d at 157 (quoting *Mullenix, v. Luna*, 136 S. Ct. 305, 308 (2015)).

-33-

**II.    The district court gave all the deference that was due the Louisiana Supreme Court's one sentence decision in this case.**

*(Responsive to Blue Brief 21-30)*

The State acknowledges, as the district court found, that the last reasoned judgment was that of the Louisiana Supreme Court, which held that Grace "fails to show that the state withheld material exculpatory evidence in violation of [*Brady*]," but then proceeds to argue that the district court erred for not giving due deference to the findings and conclusions of the intermediate appellate court.[87]   The State reasons that the Louisiana Supreme Court's terse opinion "presumably [] agreed with any reasonable analysis offered by the state intermediate court of appeals."[88]   While such presumption is appropriate when there is no reasoned decision of the higher court,[89] nothing in the law permits the habeas court to give AEDPA deference to the reasoning of both the highest court and any lower court.   Hence, the district court owed no deference to the analysis of the majority opinion of the Louisiana Fifth Circuit Court of Appeal.

Nevertheless, habeas relief is warranted in this case regardless of which state court's ruling is under review in this petition.   Regarding Sgt. Snow's testimony, the

---

[87] Blue brief at 24 & n.2.  *See* ROA.2987-88.

[88] Blue brief at 24, n.2.

[89] *Wilson v. Sellers*, 138 S. Ct. 1188 (2018).

intermediate appellate court concluded that although the State's failure to charge Hudson is "suspect," there was nonetheless "absolutely no evidence to suggest that there was a deal, formal or informal, between Hudson and the State for leniency in exchange for his testimony." And as evidence of this total *lack* of evidence, the court relied on the district attorney's representation that there was no deal because if there had been a deal, it would have been provided to defense counsel. The court also suggested that the failure to charge Hudson was mitigated by Moses's trial testimony, which implicated Hudson. The court next concluded that the failure to charge Hudson was simply an "oversight," a conclusion based on Sgt. Snow's evidentiary hearing testimony in which she explained that her pregnancy had caused her to be absent from the investigation for a period of time. Finally, the appellate court noted that the failure to arrest Hudson "has no bearing on defendant's culpability in the instant case."[90]

The appellate court's analysis begins with the paradoxical statement that the failure to charge Hudson is simultaneously "suspicious" yet devoid of evidentiary import. The failure to charge a person suspected of murder who then testifies against another person is suspicious precisely because it *is* evidence, albeit circumstantial, of favorable treatment. Moreover, the suspiciousness of the decision not to charge in

---

[90] ROA.2675.

this case is amplified, not mitigated, by the fact that Moses's trial testimony implicated Hudson in the crime. Rather, Moses's testimony is further evidence that Hudson received favorable treatment for his testimony.

On the other hand, Sgt. Snow's references to Hudson at trial as being merely a witness, and never a suspect—a falsehood unfairly bolstered by the trial court's decision to allow Hudson to lie about being at home rather than in jail—falsely implied that Hudson was never considered a suspect, notwithstanding the testimony of Moses, whose credibility was obviously problematic. Had the jury known that the lead investigator had told a grand jury that she believed that Hudson should be charged with this crime, the jury could not help but wonder why he was not charged, and defense counsel could have provided a reasonable explanation for that decision—Hudson's testimony was given with the expectation of leniency or avoidance of prosecution in whatever manner that expectation may have been divined or communicated to him by the State.

Most bizarre about the appellate court's analysis is the speculation that the failure to prosecute Hudson was a mere oversight and the further finding that there could not have been a deal because the State said there was no deal, a finding tautologically corroborated by the fact that the State did not provide a copy of the deal to the defense. In other words, the court of appeal made its own findings of fact,

one based on a credibility determination and the other on sheer speculation, and those findings contravened those made by the actual fact finder, the state postconviction trial court. In any case, the appellate court's assessment of what it believes are the facts is not relevant to the legal question, which is whether there is a reasonable probability that the timely disclosure of the grand jury testimony would have caused the jury to have a reasonable doubt as to Grace's guilt of the charged offense.

Finally, the court's entire analysis of the materiality of Snow's grand jury testimony rests on the false legal premise that in order to be material, the suppressed testimony must be evidence of an actual deal. As previously noted, this is incorrect and is not the argument raised by Grace.

In sum, the appellate court's assessment of the materiality of Sgt. Snow's grand jury testimony involves both an unreasonable application of the materiality prong of the *Brady* analysis as well as an unreasonable determination of the facts.

The appellate court's analysis of Michelle Temple's grand jury testimony is similarly unreasonable. The court concluded that her suppressed testimony was not material because (1) despite her grand jury testimony that she saw and identified the shooter, there was "no evidence" of a "positive identification of Hudson as the shooter;" (2) Temple gave many inconsistent statements and even testified to the grand jury that she saw Jessie Grace holding a gun to Palmer's head; (3) the evidence

-37-

showed that Temple did not see the shooting but only saw the victim on the ground after the shooting and thus her trial testimony "was not relevant to the actual shooting or the identity of the perpetrator;" (4) Sgt. Snow's trial testimony established that Snow did show Temple a photographic lineup with Hudson in it but that Temple did not identify Hudson as being on the scene; and (5) Temple's lack of credibility was already known to both the State and defense.[91]

Again, there is nothing reasonable about the court's application of *Brady* to Temple's grand jury testimony. First, the court is simply wrong to conclude that "despite Temple's grand jury testimony" there was "no evidence" of a "positive identification of Hudson as the shooter." Temple testified before the grand jury that she saw the shooting and the shooter, that the she identified the shooter in photos shown to her by a detective, and that she saw the shooter holding the gun to Palmer's head. Although she did not identify Hudson by name to the grand jury, there was other substantial evidence to support the conclusion that the person she was describing to the grand jury was, in fact, Derrick Hudson. Specifically, and as noted previously, she provided a physical description of the man holding the gun to Palmer's head and that description matched Hudson. Furthermore, Temple said she

---

[91] ROA.2675-77.

identified the shooter from a photo, and Sgt. Snow testified that she showed Temple a photo of Hudson and of no other suspects.

Quite simply, this *is* evidence that Hudson was the shooter. It may not be conclusive evidence, and there are, to be sure, several inconsistencies across the testimonies and the statements of Snow and Temple. But it is evidence nonetheless. The state appellate court's contrary assertion is just plain wrong.

Second, regarding Temple's purported grand jury identification of Jessie Grace, it is important to note that Temple did not, herself, give the name of the shooter. Temple did not know the shooter's name. These people were all strangers to her. Thus, when she told the story to the grand jury about seeing the short, slender, man with the fade haircut and Dickies pants holding a gun to her boyfriend's head, she gave no names. But when the ADA presiding over the grand jury sought to confirm and recap Temple's testimony, he asked her, "You saw Jesse Grace holding the gun to his head?" To which Temple said "Yes."[92] From context, it is rather obvious that Temple did not know the name of the person she claimed was the shooter and that she was willing to accept whatever name the State mentioned in its questioning. As noted previously, her description of the man holding the gun to the victim's head could not possibly have been Jessie Grace. Furthermore, Temple claimed to have identified this

---

[92] Supplemental Sealed Record on Appeal. *See* Rec. Doc. 98-1, p. 12.

person from a photo lineup and Sgt. Snow showed her a lineup with Hudson in it, not Grace. Additionally, Sgt. Snow confirmed that Temple never identified Grace as a shooter.

In other words, the appellate court's assertion that Temple's grand jury testimony "placed defendant at the scene holding gun"[93] is rather disingenuous. In any case, this easily explainable oddity in her grand jury testimony hardly serves to negate entirely the materiality of all of her grand jury testimony.

Third, the fact that the trial evidence showed that Temple did not see the shooting but only saw Palmer on the ground after the shooting in no way renders her grand jury testimony irrelevant. To the contrary, her grand jury testimony is material precisely for this reason. Temple told the jury that she looked from her position in the car in time to see people running, an obvious and immediate consequence of the shooting. Temple told the grand jury that she *did* see the shooting, or at least its immediate aftermath when the gun was still held against the decedent's head, and that she did *see* the shooter. If she was telling the truth to the grand jury, then the undisclosed evidence, unlike her trial testimony, points directly to Hudson *as the shooter* because if the shooter was chasing Palmer and was shooting at him during the chase, as the evidence indicates, then when Palmer hit the ground, the shooter would

---

[93] ROA.2676.

have quickly caught up with him, still holding the gun, still of a mind to kill his victim. Little imagination is needed to infer that the shooter might stand over his victim, place the gun against his head, confirm that the initial shots were effective, and perhaps give some parting expression of bravado. Given that Temple's description of the man standing over Palmer was undeniably that of Hudson and certainly not that of Grace, the unreasonableness of the appellate court's failure to see this as material defies understanding.

Fourth, it is likewise mystifying why the appellate court finds materiality contraindicated by Sgt. Snow's trial testimony in which she claimed that she showed Temple a photographic lineup with Hudson's photo in it but that Temple did not identify him. Sgt. Snow's trial testimony is in direct conflict with Temple's grand jury testimony. Hence, the grand jury testimony is material to challenging Sgt. Snow's credibility. It is also material to the defense theory that the State bolstered its case against Grace by suppressing evidence that pointed to Hudson's guilt.

Finally, the fact that Temple's credibility was already subject to challenge by the defense does not mitigate the materiality of her grand jury testimony. Indeed, given that Temple's trial testimony was not inculpatory, the greater value of her grand jury testimony to the defense was not in its capacity for impeachment. Rather, its

value was in its support for the defense theory that the State gave Hudson a last minute free pass to avoid a murder rap in order to secure a conviction against Grace.

While it may be true, as the court of appeal seemed to repeatedly suggest, that a jury could still have found Grace guilty had it the grand jury testimony been timely turned over to the defense, the court failed to understand that the mere existence of sufficient evidence of guilt after consideration of the suppressed evidence is not fatal to a *Brady* claim. All that is required is a showing that the favorable evidence, considered collectively, "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[94]

Of all the findings of the state appellate court, the State finds most significant one in which the state court acknowledges that the suppressed testimony inculpates Hudson. Hence, the State argues: "No United States Supreme Court case prevented the state intermediate appellate court from concluding that the grand jury testimony was not material here 'because while it inculpates Hudson, it does not, in any way, exculpate [Grace] as to his participation in the commission of the murder.'"[95] Implicit in the appellate court's statement is that evidence of Hudson's involvement in the crime has no relevance. But as fully discussed above, ample Supreme Court doctrine

---

[94] *Kyles v. Whiltely,* 514 U.S. 419, 435 (1995).

[95] Blue brief at 26, 29 (quoting appellate court) (brackets supplied by State). *See* ROA.2677.

leaves no doubt that evidence of Hudson's exposure to criminal liability goes to his credibility, thus rendering the appellate court's statement a non sequitur.

But the statement is also factually in error. The evidence of Hudson's guilt that is suggested by the suppressed testimony does indeed tend to exculpate Grace. As noted previously, the evidence that inculpates Hudson is the suppressed testimony, corroborated by Moses trial testimony, that the person who chased the victim and held a gun to his head while he was on ground dying was Hudson. In fact, Sgt. Snow agreed in the hearing held in the state habeas court, that Temple's description was that of Hudson, not Grace. This testimony obviously suggests that Hudson was the gunman and if he was, then Grace was not the gunman. No Supreme Court precedent is needed to disregard as unreasonable, if not preposterous, the finding on which the State now relies.

III.  **The State's suppression of Temple's and Snow's grand jury testimony establishes a clear violation of *Brady v. Maryland*.**

(*Responsive to Blue Brief at 30-46*)

In the final section of its brief, the State argues that even if the state court's decision was unreasonable, under a *de novo* review, the suppressed grand jury testimony of Snow and Temple is not material. The State's argument is largely repetitive of arguments made previously in its brief, and Grace has already addressed

those arguments above.   Rather than repeat those arguments, Grace takes this opportunity to challenge the State's untenable assertions regarding the strength of the State's case, assertions taken from the state appellate court's decision.

These assertions are intended to support the contention that any errors the State may have committed are harmless because the "State's case against Grace is 'ovewhelming.'"  The State thus argues that suppressed grand jury testimony had no effect on the "strongly corroborated eyewitness account" of the "independent witness" Sherman Moses whose testimony "was corroborated by the physical and forensic evidence as well as the testimony of other witnesses."  The State contends that his testimony, "corroborated by the physical evidence and other eyewitness testimony, provided strong evidence of Grace's guilt, even without the corroborating testimony of Hudson."[96]

The notion that the evidence of Grace's guilt is overwhelming is illustrative of the unreasonableness of the decisions of the state courts below and of the arguments the State has made throughout these proceedings. In truth, the jury's task of determining beyond a reasonable doubt whether then 16-year-old Jessie Grace was the person who shot and killed John Wayne Palmer turned entirely on the jury's assessment of the credibility of Sherman Moses and Derrick Hudson—Moses, a

---

[96] Blue brief at 44-45.

20-year-old drug dealer with a long criminal history, who had smoked eight or nine marijuana cigarettes just prior to the shooting, and 18-year-old Derrick Hudson, a participant in the crime with an obvious motive to shift blame away from himself.[97] And contrary to the State's assertion, there is no "forensic" or "physical" evidence whatsoever that points to Grace as the shooter.   Hence, no honest, good-faith assessment of the trial evidence permits the conclusion that the evidence in this case was "overwhelming."[98]

Furthermore, reliance on this misrepresentation of the quality of the trial evidence is particularly disingenuous for three additional reasons.  First, the evidence that the State concedes that it withheld in this case not only undermines the weak evidence presented at trial, but it strongly points to someone other than Grace as the perpetrator of the charged crime.  Second, the State well knows that at that trial, the

---

[97] *See* ROA.2988-91.

[98] *See United States v. Hand*, 184 F.3d 1322,1330-31 (11th Cir. 1999) (holding that "some circumstantial evidence" supported by the testimony of eight codefendants of questionable veracity was not "overwhelming" and was not sufficient to render harmless erroneous evidentiary ruling); *United States v. Blakey*, 14 F.3d 1557, 1561 (11th Cir.1994) (holding that evidence consisting of the testimony of three witnesses who each had "motives to lie" was "not overwhelming," such that prosecutorial misconduct was not harmless error); *United States v. Beale*, 921 F.2d 1412, 1425 (11th Cir.1991) (holding erroneous admission of evidence not harmless where the only other evidence against defendant was the uncorroborated testimony of a cooperating witness of "questionable credibility"). *Cf., Passman v. Blackburn*, 797 F.2d 1335, 1349 (5th Cir. 1986) (where conviction turns on competing testimony of defense and prosecution witnesses, "the importance of the defendant's credibility becomes so significant that prosecutorial error attacking that credibility cannot be considered harmless beyond a reasonable doubt") (quoting *Velarde v. Shulsen*, 757 F.2d 1093, 1095 (10th Cir. 1985); *Velarde*, 757 F.2d at 1095 ("where the very essence of a case is the jury's evaluation of defendant's credibility, the admission of tainted evidence cannot be considered harmless") (quoting *United States v. Johnson*, 495 F.2d 242 (10th Cir. 1974)); *accord Virgin Islands v. Testamark*, 528 F.2d 742, 743 (3rd Cir. 1976).

prosecutor got away with allowing its two "eyewitness," Hudson and Moses, to commit perjury on the witness stand on the ultimate issue of Grace's guilt, having both previously told the police that they had not seen the shooting, while testifying at trial that they had seen the shooting and that they had never said otherwise. Third, the State also knows that at trial, the state was allowed to conceal from the jury the fact that at the time of the trial, its key witness Hudson was in the Jefferson Parish jail with pending drug charges at the time of trial. In fact, the trial court allowed the state to affirmatively mislead jury into believing that Hudson was living in his own home at the time of the trial and when the police came to question him prior to trial.

Either of these blatant prosecution errors should have resulted in Grace's conviction being reversed years ago. Although judicial review of those issues is now procedurally foreclosed,[99] the factual basis for those claims are a matter of record, and the State cannot now proceed as if they don't exist.

## Conclusion

For 25 years, the State has knowingly withheld, indeed affirmatively refused to reveal, material exculpatory evidence.[100] Accordingly, this Court must affirm the

---

[99] *See* ROA.2973-77.

[100] *See* ROA.2564.

district court's judgment granting habeas relief and lift the stay order this Court issued on February 23, 2022.

Respectfully submitted,

s/ *Christopher Albert Aberle*
Christopher Albert Aberle
Attorney at Law
P.O. Box 8583
Mandeville, LA 70470-8583
(985) 871-4084
caaberle@gmail.com

*Attorney for Appellant* Jessie J. Grace, III

## Certificate of Service

I certify that a copy of this brief was electronically filed this April 1, 2022, with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

I further certify that (1) required privacy redactions have been made, 5TH CIR. R. 25.2.13; (2) the electronic submission is an exact copy of the paper Document, 5TH CIR. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

s/ *Christopher Albert Aberle*
Christopher Albert Aberle

## Certificate of Compliance

1.    This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 10,848 words excluding the parts of the brief exempted by FED. R. APP. P. 32(f).


2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect 2020 in 14-point Times New Roman.


/s/ *Christopher Albert Aberle*
Christopher A. Aberle
*Attorney for Appellant*